INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Canaveral Port Authority, et al., Intervenors.

No. 93–1812.

United States Court of Appeals, District of Columbia Circuit.

Argued May 11, 1995.

Decided June 6, 1995.

Rehearing and Suggestions for Rehearing In Banc Denied Aug. 3, 1995.

Ernest L. Mathews, Jr., New York City, argued the cause for petitioner. With him on the briefs was Maura R. Cahill, New York City.

Robert J. Englehart, Atty., N.L.R.B., Washington, DC, argued the cause for respondent. With him on the briefs were Linda R. Sher, Acting Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, and Frederick Havard, Supervisory Atty., Washington, DC. Howard E. Perlstein, Deputy Asst. Gen. Counsel, and John H. Fawley, Atty., Washington, DC, entered appearances.

Robert L. Duston, Washington, DC, argued the cause and filed the brief, for intervenor Canaveral Port Authority.

Betty S. Murphy, Washington, DC, argued the cause for intervenor Coastal Stevedoring Co., et al. With her on the joint brief were David A. Grant and Robert L. Duston, Washington, DC.

Before: EDWARDS, Chief Judge, WALD and BUCKLEY, Circuit Judges.

HARRY T. EDWARDS, Chief Judge:

This case requires us to decide whether a domestic labor union commits an unfair labor practice under the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. § 151 *et seq.* (1988), by seeking the support of Japanese unions in connection with labor disputes involving nonunion employers in the United States. Petitioner International Longshoremen's Association ("ILA") seeks review of a decision of the National Labor Relations Board ("NLRB" or "Board") holding that the ILA violated section 8(b)(4) of the Act, 29 U.S.C. § 158(b)(4), by establishing a second-

ary boycott through the actions of its putative agents, the Japanese unions. Because we hold that the Board erred in attributing the actions of the Japanese unions to the ILA, we grant the petition for review and remand the case to the Board.

■ In 1947, Congress amended the NLRA with the enactment of the Labor Management Relations Act, ch. 120, 61 Stat. 136 (1947) ("LMRA"). A principal provision of the LMRA was the section 8(b)(4) proscription of "secondary boycotts"—a practice aptly described as "a combination to influence A by exerting some sort of economic or social pressure against persons who deal with A." FELIX FRANKFURTER & NATHAN GREENE, THE LABOR INJUNCTION 43 (1930) (footnote omitted). As this description implies, secondary boycotts embroil *neutral* parties in disputes between employees and their employers, and it is for this reason that Congress has condemned them. *See International Longshoremen's Ass'n v. Allied Int'l, Inc.,* 456 U.S. 212, 225, 102 S.Ct. 1656, 1664, 72 L.Ed.2d 21 (1982) (stating that Congress drafted section 8(b)(4) "to protect neutral parties, the helpless victims of quarrels that do not concern them at all") (internal quotations omitted). However, in drafting section 8(b)(4), Congress did not create a "sweeping prohibition" on all forms of secondary boycotts. *Local 1976, United Bhd. of Carpenters v. NLRB,* 357 U.S. 93, 98, 78 S.Ct. 1011, 1015, 2 L.Ed.2d 1186 (1958). Rather, the provision "describes and condemns specific union conduct directed to specific objectives." *Id.* Thus, section 8(b)(4)(i) specifically targets union actions to engage in, or induce or encourage others employed in commerce to engage in, a strike or refusal to work on goods, *see* 29 U.S.C. § 158(b)(4)(i), and section 8(b)(4)(ii) prohibits union actions to threaten or coerce persons engaged in commerce, *see id.* § 158(b)(4)(ii), where in either case the object of such action is to force a person to cease using or otherwise dealing in the products of another, *see id.* § 158(b)(4)(B). In this case, the ILA did neither.

The undisputed facts reveal that the ILA merely requested assistance from Japanese labor unions in its dispute with two nonunion stevedoring companies engaged in Florida's citrus fruit export trade. In response, the Japanese unions gave notice that their members would refuse to unload any fruit in Japan that had been loaded in Florida by nonunion workers. As a consequence of this threat, all Florida–Japan citrus shipments were redirected to new ports of embarkment during the 1990–1991 export season. The parties adversely affected by these actions—the two stevedoring companies and one neutral party—filed unfair labor practice charges against the ILA.

Upon reviewing the unfair labor practice charges, the Board held that the ILA had violated the prohibition against secondary boycotts. In reaching this conclusion, however, the Board could not rely on section 8(b)(4)(i), for, although the ILA arguably induced or encouraged other employees to refuse to handle goods, the employees to whom the ILA's entreaties were addressed were Japanese longshoremen, who are not employed by a person "engaged in commerce" as the Act requires. 29 U.S.C. § 158(b)(4)(i). Nor could the Board find that the ILA's actions, standing alone, fell within the scope of section 8(b)(4)(ii), because the Japanese unions, not the ILA, issued the alleged threats that created the boycott. Nevertheless, the Board held that the ILA's actions fell within the scope of section 8(b)(4)(ii) pursuant to a theory of agency law. Under this theory, the Board held that the Japanese unions acted as the agents of the ILA merely because the ILA requested the Japanese unions' actions and benefited from the results of those actions.

In its petition for review, the ILA claims that the Board's agency theory is untenable. We agree. Not only is the Board's theory completely without support in nearly 50 years of NLRB and judicial precedent interpreting the secondary boycott provision of the NLRA, but it flies in the face of the common law agency principles that Congress sought to incorporate into the Act. Put simply, the ILA and the Japanese unions were completely independent entities; neither exercised any control over the other. If they were bound together at all, it was by a spirit of labor solidarity, but such a spiritual link is

too frail to render one union the agent of another. Thus, we reject the Board's theory and remand the case for further consideration.

## I. BACKGROUND

This case arises from a labor dispute in the Florida citrus export industry. Japan is a major importer of Florida citrus fruit, and, prior to the events at issue in this case, Florida exporters had shipped fruit to Japan from Fort Pierce and Port Canaveral for several years pursuant to agreements between American exporters and Japanese importers. In the shipping process, American stevedores load the fruit on ships bound for Japan, where the fruit is unloaded by Japanese stevedores. Coastal Stevedoring Co. ("Coastal"), a nonunion company, is the sole stevedoring company in Fort Pierce. Port Canaveral Stevedoring, Ltd. ("Canaveral"), also a nonunion company, conducts business from Port Canaveral, which is operated by a Florida state entity, the Canaveral Port Authority. The ILA has been engaged in labor disputes with Coastal and Canaveral regarding those companies' failures to hire union-represented employees.

Before the 1990–91 citrus export season, ILA representatives visited Japan and met with representatives of several Japanese unions to express concern that Japanese importers were using the services of nonunion stevedores at Port Canaveral and Fort Pierce, and to request assistance in their ongoing dispute with nonunion companies. In response, the Japanese unions asked numerous stevedoring companies, citrus importers, and shipping companies to ensure that all citrus fruit they imported from Florida was loaded by union workers. Further, the Japanese unions warned that they would refuse to unload any fruit loaded by nonunion workers.

In a letter to the Japanese dockworkers' unions dated October 4, 1990, ILA President John Bowers stated that the ILA was planning to picket nonunion stevedoring companies at Fort Pierce and Port Canaveral, and asked for the support of the Japanese unions. Bowers closed the letter by stating, "Your further support in denying the unloading and landing of these picketed products in your country will also be most helpful to the members of the [ILA] and organized labor in the United States which supports our effort." Letter from John Bowers to Toshio Kamezaki (Oct. 4, 1990), *reprinted in* Joint Appendix ("J.A.") 64. The Japanese unions circulated copies of Bowers's letter to various citrus importers, exporters, and shipping companies. As a result, Japanese importers expressed concern to Florida exporters that citrus fruit loaded by nonunion workers would not be unloaded by Japanese longshoremen.

By late October 1990, after having failed to obtain assurances that Japanese dockworkers would unload fruit loaded by nonunion workers, one Japanese importer, Sumisho Fruits and Vegetables Co., and its carrier, Cool Carriers, Inc., directed the ship *Bagno El Triunfo* to go to Tampa for loading by union stevedores, instead of to Fort Pierce as originally scheduled. By letter dated November 6, 1990, ILA Special Consultant Ernest S. Lee wrote to the Japanese dockworkers' unions to state that the diversion of the ship was "a direct result of your very timely and effective notices to relevant parties in Japan of your support for our efforts.... Thank you." Letter from Ernest S. Lee to Toshio Kamezaki (Nov. 6, 1990), *reprinted in* J.A. 79. In the letter, Lee also advised that "[y]our continued efforts on our behalf will be most appreciated." *Id.* Following the lead of Sumisho Fruits and Vegetables, several Japanese importers during December 1990 informed United States exporters that their ships would be loaded at Tampa instead of Port Canaveral because of the threat by Japanese unions. Ultimately, the Japanese unions' actions caused all citrus exports from Florida to Japan during the 1990–91 season to be shipped from Tampa, and none to be shipped from Fort Pierce or Port Canaveral.

Meanwhile, in November and December 1990, Coastal, Canaveral, and the Canaveral Port Authority all filed unfair labor practice charges against the ILA. Subsequently, on June 14, 1991, the NLRB sought an injunction to prohibit the ILA from threatening persons neutral to its labor dispute with Coastal and Canaveral, and to require the

union to repudiate its written solicitation of aid from the Japanese unions. The United States District Court for the Middle District of Florida granted the injunction and the Eleventh Circuit affirmed. *See Dowd v. ILA,* 781 F.Supp. 1565 (M.D.Fla.1991), *aff'd,* 975 F.2d 779 (11th Cir.1992). In its decision, the Eleventh Circuit held that the Board had demonstrated reasonable cause to believe that the ILA had violated NLRA section 8(b)(4)(ii)(B) by articulating "a substantial and not frivolous legal theory upon which to attribute the actions of the Japanese unions to ILA." 975 F.2d at 784. Specifically, although acknowledging that the ILA had no right of control over the Japanese unions as normally is required to create an agency relationship, the Eleventh Circuit concluded that,

> [u]nder the liberal application of agency concepts appropriate in the labor context, a contractual right to control and direct the performance of another is not required to impose responsibility under section 8(b) where an employer or union has encouraged or requested another to engage in unfair labor practices on its behalf.

*Id.* at 785 (footnote omitted). The court also agreed with the Board that the ILA was responsible for the Japanese unions' actions under theories of ratification and joint venture. *Id.* at 785–86. Finally, in response to the ILA's argument that application of the NLRA to acts taken in Japan constituted an impermissible extraterritorial extension of domestic federal law, the Eleventh Circuit stated that "the NLRA reaches the conduct of an American union which solicits a foreign entity to apply pressure overseas with the intent and effect of gaining an unlawful advantage in a primary labor dispute in the United States by coercing American employers." *Id.* at 788.

With the injunction in place, the parties waived a hearing and an administrative law judge's decision and submitted the case directly to the Board based on stipulated facts. On November 24, 1993, the Board held that the ILA had violated NLRA section 8(b)(4)(ii)(B) by threatening, coercing, or restraining neutral persons engaged in commerce in the citrus import and export indus-

try with the object of forcing or requiring them to cease doing business with Coastal, Canaveral, and other nonunion stevedoring companies in Fort Pierce and Port Canaveral. *See ILA,* 313 N.L.R.B. 412, 1993 WL 497343 (1993). In so doing, a majority of the Board concluded that, although the threats in this case actually emanated from the Japanese unions, the ILA was responsible for those threats under an agency law theory. In reaching this conclusion, the Board relied upon its earlier decision in *United Pipefitters Local 280 (Aero Plumbing Co.),* 184 N.L.R.B. 398 (1970). In that case, Local 280 sought an agreement with Aero Plumbing Co. ("Aero"), a plumbing contractor, and, to that end, alerted another local, Local 78, that Aero would be working within its jurisdiction, and asked Local 78 to attempt to persuade the contractor to sign the agreement. When, in response, Local 78 picketed Aero's job site, the Board held Local 280 responsible for the resulting unfair labor practice. In the decision below, the Board reasoned that the conduct of the ILA in this case "is virtually identical to that of the Local 280 in *Aero Plumbing* with respect to informing the other union of its difficulties with an employer, requesting certain supportive action by the other union, and taking full advantage of the benefits of the other union's action." 313 N.L.R.B. at 416. Accordingly, the Board held that, as in *Aero Plumbing,* the ILA's conduct here "amounted to authorization and ratification" of the Japanese unions' actions. *Id.* The Board also found policy considerations to support an agency theory in this case, despite the international character of the underlying dispute, because "[p]ermitting U.S. unions to escape responsibility purely on geographical grounds for the economic harm they unleash subverts the purpose of the [NLRA]." *Id.* Finally, the Board agreed with the Eleventh Circuit's conclusion that the Board had jurisdiction over this case under the NLRA, notwithstanding that all illegal conduct occurred in Japan, because the assertion of such jurisdiction did not interfere with Japanese law. *See id.* at 417–18. Thus, the Board ordered the ILA to cease and desist from requesting assistance from the Japanese unions, to repudiate its earlier requests, and to post a notice in its

offices of the unfair labor practice it had committed.

## II. ANALYSIS

In its petition for review, the ILA presents a two-pronged attack on the Board's decision. First, the ILA argues that the Board's action constituted an impermissible extraterritorial application of the NLRA, because the threats giving rise to the unfair labor practice charge in this case occurred in Japan. Second, it contends that the Board erred in holding that the Japanese unions were acting as the agents of the ILA when they threatened to boycott products loaded by nonunion labor.

As an initial matter, we note that the Board in its decision below stated explicitly that "[n]o direct conduct by the [ILA] is alleged to be unlawful in this case. All the allegedly unlawful acts were committed solely by the Japanese Unions." *ILA,* 313 N.L.R.B. at 414, 1993 WL 497343. Therefore, because the Board's decision appears to focus almost entirely on conduct taken outside the United States, a substantial question is raised regarding the extraterritorial reach of the NLRA. However, we need not resolve that issue to dispose of this case. We are required to address the question whether the NLRA reaches acts taken in Japan by Japanese unions only if we first agree with the Board that the Japanese unions served as the agents of the ILA in undertaking the conduct at issue, for only then are actions occurring on foreign soil potentially brought within the purview of the Act. We will indulge an assumption that the Board has applied the NLRA only domestically in this case, for our conclusion with respect to the Board's agency theory fully resolves the dispute between the parties.

■ The Board itself acknowledges that its agency law theory is the linchpin of its unfair labor practice finding. The Board held,[1] and its counsel conceded at oral argument, that, standing alone, the ILA's request for assistance from Japanese unions in its

ongoing dispute with nonunion Florida stevedoring companies was not unlawful under the NLRA. An examination of the plain language of the statute demonstrates the propriety of the Board's concession. NLRA section 8(b)(4)(B) makes it an unfair labor practice

for a labor organization or its agents ... (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

\*　　\*　　\*　　\*　　\*　　\*

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person.

29 U.S.C. § 158(b)(4)(B). Thus, section 8(b)(4)(i)(B) prohibits a union from inducing or encouraging other employees to refuse to handle goods with an object of forcing a person to cease doing business with another—*i.e.,* it prohibits conduct much like that undertaken by the ILA here. However, subsection (i) prohibits such conduct only where the employees who received the inducements or encouragement were themselves employed by a "person engaged in commerce or in an industry affecting commerce." *Id.* § 158(b)(4)(i). Here, of course, the recipients of the ILA's inducements were employed by Japanese stevedoring companies, and it is well-established that foreign workers in foreign countries are not engaged in commerce within the meaning of the Act.[2]

---

1. In noting that its remedial order in this case had no direct impact on the Japanese unions, the Board explained that "[t]his is not to say that the [ILA's] request, standing alone, was the unfair labor practice. As explained above, the unfair

labor practice was the conduct of the Japanese Unions, for which the Respondent [ILA] is responsible." *Id.* at 418 n. 17, 1993 WL 497343.

2. The NLRA defines the term "commerce" to mean

*See Benz v. Compania Naviera Hidalgo,* 353 U.S. 138, 144, 77 S.Ct. 699, 702, 1 L.Ed.2d 709 (1957) (noting NLRA's focus on "the *American* workingman" and describing the "boundaries of the Act as including only the workingmen of our own country and its possessions") (internal quotations omitted); *see also Incres S.S. Co. v. International Maritime Workers Union,* 372 U.S. 24, 27, 83 S.Ct. 611, 613, 9 L.Ed.2d 557 (1963) ("The Board's jurisdiction to prevent unfair labor practices ... is based upon circumstances 'affecting commerce,' and we have concluded that maritime operations of foreign-flag ships employing alien seamen are not in 'commerce' within the meaning of [the NLRA]."). Accordingly, the ILA's inducements were not among those targeted by section 8(b)(4)(i)(B).

The Board's counsel also conceded at oral argument that, had the Japanese unions acted without any request for help from the ILA, their acts would have been beyond the scope of the NLRA. This concession also was well-founded. Although NLRA section 8(b)(4)(ii)(B) by its terms prohibits a labor organization from threatening or coercing a person to boycott the products of a third party, the threats in this case issued from Japanese unions operating in Japan. Accordingly, any unfair labor practice charge against the Japanese unions under section 8(b)(4)(ii)(B) would have required a purely extraterritorial application of the NLRA—an application that we could condone only upon finding "the affirmative intention of the Congress clearly expressed." *EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 248, 111 S.Ct. 1227, 1230, 113 L.Ed.2d 274 (1991) (quoting *Benz,* 353 U.S. at 147, 77 S.Ct. at 704). However, the Supreme Court in a long line of cases has held that Congress never intended the Act to apply to labor disputes involving foreign workers operating under foreign laws on foreign-flag ships, *see, e.g.,*

*American Radio Ass'n v. Mobile S.S. Ass'n, Inc.,* 419 U.S. 215, 221–25, 95 S.Ct. 409, 413–15, 42 L.Ed.2d 399 (1974); *Windward Shipping v. American Radio Ass'n,* 415 U.S. 104, 113–15, 94 S.Ct. 959, 964–65, 39 L.Ed.2d 195 (1974); *Incres S.S. Co.,* 372 U.S. at 26–28, 83 S.Ct. at 612–13; *McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 19–22, 83 S.Ct. 671, 676–78, 9 L.Ed.2d 547 (1963); *Benz,* 353 U.S. at 143–44, 77 S.Ct. at 702, and we certainly can conceive of no basis for a different result where the relevant dispute occurs on foreign soil, *cf. Labor Union of Pico Korea v. Pico Prods., Inc.,* 968 F.2d 191, 194–96 (2d Cir.) (holding section 301 of LMRA inapplicable to labor contract executed between South Korean union and wholly-owned South Korean subsidiary of American corporation), *cert. denied,* —— U.S. ——, 113 S.Ct. 493, 121 L.Ed.2d 431 (1992); *RCA OMS, Inc.,* 202 N.L.R.B. 228, 1973 WL 12138 (1973) (holding NLRA inapplicable to employees located in Greenland). Of course, if the ILA itself had issued the threats involved in this case, the Board could have taken action against that union under section 8(b)(4)(ii)(B), for the ILA is a domestic entity. However, the undisputed facts present no basis for such a charge; the Japanese unions assisted the ILA not because they were coerced, but because they sympathized with the ILA's objectives. Thus, as the Board has acknowledged, this case gives rise to an unfair labor practice under NLRA section 8(b)(4)(ii)(B) only if the threats issued by the Japanese unions somehow may be attributed to the ILA. Accordingly, we turn to the parties' agency law arguments.

In considering questions of agency under the NLRA, we must construe section 2(13), which provides that, "[i]n determining whether any person is acting as an 'agent' of

trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia or any Territory of the United States and any State or other Territory, or between any foreign country and any State, Territory, or the District of Columbia, or within the District of Columbia or any Territory, or between points in the same State but through any other State or any Territory or the District of Columbia or any foreign country.

29 U.S.C. § 152(6). It also defines the term "affecting commerce" to mean

in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce.

*Id.* § 152(7).

another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." 29 U.S.C. § 152(13). Congress added this provision to the Act as part of the LMRA, and the legislative history of that statute makes clear that it was designed to render "both employers and labor organizations ... responsible for the acts of their agents in accordance with the ordinary common law rules of agency." [3] H.R.Conf.Rep. No. 510, 80th Cong., 1st Sess. 36 (1947) U.S.Code Cong.Serv. 1947, pp. 1135, 1142; see also 93 Cong.Rec. 6859 (1947) (statement of Sen. Taft) (stating agreement of conference committee that "the ordinary law of agency should apply to employer and union representatives"); Local 1814, ILA v. NLRB, 735 F.2d 1384, 1394 (D.C.Cir.) ("Beyond doubt, the legislative intent of [section 2(13) ] was to make the ordinary law of agency applicable to the attribution of individual acts to both employers and unions."), cert. denied, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984).

For this reason, we accord only limited deference to the Board's agency law analysis. Our cases establish that, when confronted with a question regarding the meaning of an NLRA provision incorporating com-mon law agency principles, we need not defer to the agency's judgment as we normally might under the doctrine of Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). See Aurora Packing Co. v. NLRB, 904 F.2d 73, 75–76 (D.C.Cir. 1990) ("Deference under the Chevron doctrine ... does not apply here because of the 1947 congressional direction that the Board and the courts apply the common law of agency to the issue.") (footnote omitted); North Am. Van Lines, Inc. v. NLRB, 869 F.2d 596, 598 (D.C.Cir.1989) (stating that "the court is not to extend any great amount of deference" to NLRB's interpretation of statutory provision incorporating common law of agency) (internal quotations omitted).[4] Nevertheless, because even common law agency questions are "permeated at the fringes by conclusions drawn from the factual setting of the particular industrial dispute," North Am. Van Lines, Inc., 869 F.2d at 599, our standard of review is not de novo. Rather, in a situation of this sort, we must give due weight to the Board's judgment to the extent that "it made a choice between two fairly conflicting views." Id. (quoting NLRB v. United Ins. Co., 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968)).[5]

3. As the legislative history demonstrates, see 93 Cong.Rec. 6859 (statement of Sen. Taft), the 80th Congress drafted the specific language of NLRA section 2(13), providing that neither authorization nor ratification shall be dispositive of agency issues, to overrule the Supreme Court's then-recent decision in United Bhd. of Carpenters v. United States, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973 (1947). The Court in that case held that labor unions and their members could be held responsible for the illegal actions of individual officers or members committed during labor disputes only if they "actually participated, gave prior authorization, or ratified such acts after actual knowledge of their perpetration." Id. at 403, 67 S.Ct. at 779 (footnote omitted). As Justice Frankfurter noted in dissent, the majority's decision imposed evidentiary burdens that exceeded those established by the common law of agency. See id. at 417–20, 67 S.Ct. at 786–88 (Frankfurter, J., dissenting). The Congress that passed the LMRA therefore designed section 2(13) to "restore[ ] the law of agency as it has been developed at common law." 93 Cong.Rec. 6859 (statement of Sen. Taft).

4. As the court noted in Aurora Packing Co.,

Chevron presumes that Congress delegated primarily to executive branch agencies the interpretation of ambiguous [statutory] terms ... in part because of an agency's expertise, and in part because of the policy role inherent in that function—which the Court thought Congress prefers the agencies rather than the nonelected judiciary to perform. See 467 U.S. at 843–44[, 104 S.Ct. at 2781–82]. When Congress indicated that it wanted the judge-made common law of agency to govern the construction of [a statutory provision], it rejected the basis of these presumptions.

904 F.2d at 76 n. 1 (citation omitted); see also NLRB v. United Ins. Co., 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968) (stating that "a determination of pure agency law involve[s] no special administrative expertise that a court does not possess").

5. The result we reach in this case would be the same even if the Chevron doctrine were fully applicable. For one thing, there is no doubt that the Board's decision is not supported by the plain meaning of section 2(13). See Chevron, 467 U.S. at 842–43, 104 S.Ct. at 2781 ("If the intent of Congress is clear, that is the end of the matter;

Applying that standard here, we cannot say that the Board's decision represented "a choice between two fairly conflicting views," for, in our view, the Japanese unions were in no sense the agents of the ILA. It is a fundamental principle of hornbook agency law that an agency relationship arises only where the principal "has the right to control the conduct of the agent with respect to matters entrusted to him." RESTATEMENT (SECOND) OF AGENCY § 14 (1958); accord Eyerman v. Mary Kay Cosmetics, Inc., 967 F.2d 213, 219 (6th Cir.1992); United Packinghouse Workers v. Maurer–Neuer, Inc., 272 F.2d 647, 648 (10th Cir.1959), cert. denied, 362 U.S. 904, 80 S.Ct. 611, 4 L.Ed.2d 555 (1960); see also, e.g., Edwards v. John Hancock Mut. Life Ins. Co., 973 F.2d 1027, 1031–33 (1st Cir.1992) (finding that trustees were agents of insurance company where deeds of trust empowered company to control conduct of trustees with respect to property at issue). Indeed, as to this requirement, the Restatement's reporter comments that, "[i]f the existence of an agency relation is not otherwise clearly shown, as where the issue is whether ... an agency has been created, the fact that it is understood that the person acting is not to be subject to the control of the other as to the manner of performance determines that the relation is not that of agency." RESTATEMENT (SECOND) OF AGENCY § 14 cmt. b. Here, the ILA exercised no control over the conduct of the Japanese unions. To the contrary, the ILA and the Japanese unions are completely independent entities, bound together only by the fact that both seek to further the goals of organized labor worldwide. We discern nothing in the law of agency to support a theory transforming one union into the agent of another based upon the spirit of labor solidarity alone.

Certainly, none of the cases cited by the Board supports such a theory. Neither the Board nor any of its supporting intervenors has cited a single case involving two unions situated similarly to those here in which one has been held the agent of the other. The Board in its decision below relied heavily upon its reasoning in the previously discussed Aero Plumbing case, in which it attributed the actions of one local union to another. See 184 N.L.R.B. at 398. We note initially that the attribution theory adopted by the Board in that case never has received judicial approval.[6] Even assuming its validity, however, we find Aero Plumbing readily distinguishable. The two unions involved in that case were sister locals of a single parent union operating under the same collective bargaining agreement.[7] Therefore, the Board's decision in Aero Plumbing may be viewed as no more than a particularized application in the labor context of the common law principle that one agent is liable for the tortious actions of another if he or she directs such actions. See RESTATEMENT (SECOND) OF AGENCY § 358(1). No matter how interpreted, however, Aero Plumbing involved a relationship between two unions bound by a formal affiliation and a common agreement, and, thus, the relationship was far closer than that existing between the Japanese unions and the ILA. Accordingly, it provides no support for the Board's finding of an agency relationship in this case.[8]

for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). And, even assuming, arguendo, that section 2(13) is ambiguous in its definition of "agent," we would reject the Board's interpretation as wholly unreasonable under well-established principles of agency law. See id. at 844, 104 S.Ct. at 2782 (stating that court must defer to agency's "reasonable interpretation" of ambiguous language in statute it administers).

6. Although the labor dispute at issue in Aero Plumbing eventually reached the Ninth Circuit, the court did not review the Board's attribution theory, but rather considered only the enforceability of a labor contract containing provisions obtained by the union through unfair labor prac-

tices. See NLRB v. Southern California Pipe Trades Dist. Council No. 16, 449 F.2d 668 (9th Cir.1971).

7. Both were affiliated with the Southern California Pipe Trades District Council No. 16 of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL–CIO. See 184 N.L.R.B. at 398–99, 400.

8. The same is true of another case cited by the Board in its decision below, ILA (Shipside Packing Co.), 227 N.L.R.B. 659, 1976 WL 7703 (1976). In that case, the Board held ILA Local 333 responsible for the unlawful activities of ILA Local 953, stating that Local 333 "was aware of

We also are unpersuaded by the Board's reliance on language from *Local 1814, ILA v. NLRB*, 735 F.2d at 1384. In that case, we said that

> [t]ransplantation of ordinary agency law, which arises out of ordinary contract and tort disputes, into the NLRA context necessarily requires sensitivity to the particular circumstances of industrial labor relations. Courts have concluded that under the NLRA, agency principles must be expansively construed, including when questions of *union* responsibility are presented.

*Id.* at 1394. However, to say that we must construe agency principles expansively under the NLRA is not to say that we may abandon the core principles of agency law. Indeed, in *Local 1814* itself, we applied principles derived from the "scope of employment" branch of agency law to determine that a union officer acted as an agent of Local 1814 when he entered into an illegal kickback agreement. 735 F.2d at 1394–95. Although we inferred that the officer was authorized by the union to enter the illegal scheme based on his "actual authority over representational matters in general, together with the substantial benefits received by Local 1814 as a result [of] the entire agreement of which the kickback arrangement was an integral part," 735 F.2d at 1397, we did not discard the basic agency law rule that a principal is liable for only those acts of its agent committed within the scope of employment, nor could we have done so without also discarding our duty to apply the NLRA consistently with the intent of Congress.

Equally inapposite are cases in which courts have held employers responsible for the actions of employees and others conducting anti-union campaigns. Chief among such cases are the Supreme Court's decisions in *International Ass'n of Machinists v. NLRB*, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50 (1940), and *H.J. Heinz Co. v. NLRB*, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309 (1941). In the former case, the Court affirmed a Board decision holding an employer responsible for

the actions of four senior employees who, in conversations with coworkers during the weeks preceding a plant election pitting one union against another, stressed the employer's preference for one union and suggested that employees siding with that union would receive better treatment—all with the apparent acquiescence of the employer itself. *See* 311 U.S. at 76–77, 61 S.Ct. at 86–87. Reviewing these circumstances, the Court stated that, "where the employees would have just cause to believe that solicitors professedly for a labor organization were acting for and on behalf of the management, the Board would be justified in concluding that they did not have the complete and unhampered freedom of choice which the Act contemplates." *Id.* at 80, 61 S.Ct. at 88 (footnote omitted). Similarly, in *H.J. Heinz Co.*, 311 U.S. at 520–21, 61 S.Ct. at 323, the Court attributed to an employer the actions of superintendents and foremen who conducted a zealous anti-union campaign, where the employer failed to disavow their efforts even after receiving a complaint from a union representative. Lower courts have extended the rationale of such cases to hold employers responsible for the actions of even some non-employee third parties. *See, e.g., Cagle's Inc. v. NLRB*, 588 F.2d 943, 947–48 (5th Cir.1979) (holding employer responsible for actions of local chamber of commerce official who campaigned against union and acted as *de facto* intermediary between union committee and employer).

However, as the foregoing description suggests, the holdings of *International Association of Machinists* and its progeny turn upon the reasonable perceptions of those involved in the collective bargaining process. Thus, the courts in those cases held employers liable for the unlawful conduct of third parties when, under all the circumstances, employees *reasonably* could have believed that such third parties were acting for and on behalf of the employer.[9] *See* 311 U.S. at 80, 61 S.Ct. at 88 (attributing acts of employees to employer "where the employees would have just cause to believe" that employer was

---

the activities, knew they were on behalf of the employees it represents, and, therefore, is responsible for the activities found illegal herein." *Id.* at 659 n. 1, 1976 WL 7703. As the foregoing recitation of facts suggests, both Local 333 and Local 953 were sister locals of the ILA.

9. In this respect, this line of precedent appears to proceed upon a theory similar to the common law agency doctrine of apparent authority, which holds a principal responsible for the acts of an alleged agent where the principal, "by written or spoken words or any other conduct ..., reason-

responsible); *Cagle's, Inc.*, 588 F.2d at 948 ("The record fully supports the Board's finding that [the chamber of commerce official] represented corporate policy in the eyes of union members."). Here, by contrast, nothing in the record suggests that any party perceived the Japanese unions to be the agents of the ILA, nor that such a perception would have been reasonably justified had it arisen. Thus, nothing in this line of precedent supports the theory that one union may become the agent of a second, completely independent union merely by responding to a request for assistance in a labor dispute.

Indeed, at bottom, the Board's theory depends not upon a liberal construction of agency principles, but upon a complete abrogation of such principles. Were we to accept the Board's theory, the notion of "agency" under the NLRA would become a limitless doctrine to be applied wherever it becomes necessary to attribute the actions of one entity to another in order to effectuate what the Board perceives to be the purposes of the Act. This view ignores the fact that Congress in the NLRA enacted specific—not blanket—prohibitions on certain conduct, including secondary boycotts. As the Supreme Court has stated, "[w]hatever may have been said in Congress preceding the passage of the Taft–Hartley Act concerning the evil of all forms of 'secondary boycotts' and the desirability of outlawing them, it is clear that no such sweeping prohibition was in fact enacted." *Local 1976, United Bhd. of Carpenters*, 357 U.S. at 98, 78 S.Ct. at 1015. Instead, the NLRA's secondary boycott provision targets specific union conduct by means of carefully circumscribed legislative language, *see id.*, and we would subvert rather than effectuate the statute by allowing the Board to nullify its express limitations through the application of an infinitely malleable agency theory. We are not shaken in this conclusion by the Board's claim that legal principles in the labor arena must expand to address newly emerging problems on an international scale. If the nation's increasingly global economy requires an expansion of federal labor law, it is for Congress—not the Board or the federal courts—to make

the necessary changes. *See Arabian American Oil Co.*, 499 U.S. at 259, 111 S.Ct. at 1236 (holding that Title VII does not apply extraterritorially, but noting that "Congress, should it wish to do so, may . . . amend Title VII and in doing so will be able to calibrate its provisions in a way that we cannot.").

Finally, we observe that, in addition to its other flaws, the agency theory propounded by the Board in this case is impractical. The Board at oral argument acknowledged that the ILA could have evaded an unfair labor practice finding in this case merely by publicizing its labor dispute with Florida stevedoring companies and then disclaiming responsibility for any assistance offered by other unions, for in that case a critical element of the Board's agency theory—the ILA's request for specific assistance—would be absent. Moreover, the Board's theory appears to have little application beyond this case. Even were we to uphold the Board's decision, unions in future cases surely could seek aid from their foreign counterparts without expressly soliciting such assistance as the ILA did here.

In sum, we hold that the Board erred in attributing the actions of the Japanese unions to the ILA for the purpose of an unfair labor practice finding under NLRA section 8(b)(4)(ii)(B). In this regard, to the extent that the Eleventh Circuit reached a contrary conclusion, we respectfully disagree. Bereft of its underlying agency theory, the Board's cease and desist order in this case merely prohibits the ILA from requesting assistance from the Japanese unions—an action that, as we have said, the Board has conceded to be lawful. Thus, we grant the petition for review.

### III. CONCLUSION

For the foregoing reasons, this case is remanded to the Board for further proceedings consistent with this opinion.

*So ordered.*

---

ably interpreted, causes [a] third person to believe that the principal consents to have the act done on his behalf by the person purporting to

act for him." RESTATEMENT (SECOND) OF AGENCY § 27.