

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-31-1998

# NLRB v. Local 19

Precedential or Non-Precedential:

Docket 97-3459,97-3470

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"NLRB v. Local 19" (1998). *1998 Decisions.* Paper 208.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/208

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 31, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 97-3459 & 97-3470

NATIONAL LABOR RELATIONS BOARD,
        Petitioner No. 97-3459

v.

SHEET METAL WORKERS' INTERNATIONAL
ASSOCIATION, LOCAL UNION No. 19

ASSOCIATED BUILDINGS AND CONTRACTORS, INC.,
Southeast Pennsylvania, Keystone, Delaware and New
Jersey Chapters,
        Amicus Curiae

SHEET METAL WORKERS' INTERNATIONAL
ASSOCIATION, LOCAL UNION No. 19,
        Petitioner No. 97-3470

v.

NATIONAL LABOR RELATIONS BOARD,

ASSOCIATED BUILDINGS AND CONTRACTORS, INC.,
Southeast Pennsylvania, Keystone, Delaware and New
Jersey Chapters,
        Amicus Curiae

On Petition for Enforcement and
Cross Petition for Review

Argued May 18, 1998

Before: ROTH and MCKEE, Circuit Judges, and
O'NEILL, Senior District Judge*

(Filed: August 31, 1998)

       Bruce E. Endy (argued)
       Spear, Wilderman, Borish, Endy,
        Spear and Runckel
       230 South Broad Street, Suite 1400
       Philadelphia, PA 19102
        Attorney for Local Union 19

       Aileen A. Armstrong
       Deputy Associate General Counsel
       Jeffrey L. Horowitz (argued)
       Frederic C. Harvard
       National Labor Relations Board
       1099 14th Street, N.W.
       Washington, D.C. 20570
        Attorneys for National Labor
        Relations Board

       Lawrence C. Coburn
       Pepper Hamilton LLP
       3000 Two Logan Square
       18th & Arch Streets
       Philadelphia, PA 19103
        Attorney for amicus curiae

OPINION OF THE COURT

O'NEILL, Senior District Judge:

This case requires us to decide whether a labor union may be liable for unfair labor practices under the National Labor Relations Act (NLRA or the Act), 29 U.S.C.A.S 151–

_____

*The Honorable Thomas N. O'Neill, Jr., Senior District Judge of the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

160 (West 1973), due to the actions of fellow unions pursuant to a joint venture theory of agency. We answer that question in the negative and remand to the Board for further proceedings consistent with this opinion.1

I.

This case is before us on application of the Board for enforcement of its order against Sheet Metal Workers International Association, Local Union No. 19 (Union or Local No. 19) and the Union's cross petition for review of the Board's order. Unfair labor practice charges were filed against the Union by Delcard Associates, Inc., Omni Mechanical, Inc. and Joseph Stong, Inc. After investigating these charges, the Board's General Counsel issued complaints alleging that the Union violated SS 8(b)(1)(A) and 8(b)(4)(ii)(B) of the Act, 29 U.S.C.A. SS 158(b)(1)(A) and 158(b)(4)(ii)(B), by restraining, coercing and threatening employees seeking access to their jobsites and by picketing at jobsite gates reserved for use by neutral employers.2 The complaints were consolidated for trial before an Administrative Law Judge.

Following six days of hearings, the A.L.J. issued an opinion in which he found that the Union committed unfair labor practices at all three of the job sites. In addition, the A.L.J. found that the Union engaged in a joint venture with four other unions picketing at the Stong job site and was jointly responsible for unfair labor practices committed by those unions. The A.L.J. recommended a broad order requiring the Union to cease and desist from restraining and coercing employees of the three employers and any other employer.

The Union filed exceptions to the A.L.J.'s findings of fact and legal conclusions and to the recommended order. With some minor exceptions not relevant here, the Board

_____

1. We have appellate jurisdiction over the Board's petition seeking enforcement and the Union's petition for review pursuant to SS 10(e) and 10(f) of the NLRA, 29 U.S.C.A. S 160(e) and (f), respectively.

2. The Board's General Counsel issued three different complaints reflecting the three different job sites, Delcard, Omni and Stong.

3

adopted the A.L.J.'s conclusions including the determination that the Union "was engaged in a joint venture with several other unions and thus was liable for the unlawful acts committed by the other unions," as well as the recommended broad cease and desist order. Sheet Metal Workers Int'l Ass'n, Local No. 19, 316 N.L.R.B. 426, 4-CB-3783, 4-CB-6879, 4-CB-6944, and 4-CC-2005-1, 1995 WL 77107, at *1 (N.L.R.B. February 23, 1995).

II.

The factual background of this matter is fully described in the A.L.J.'s opinion and requires recital here only insofar as is relevant to resolution of the joint venture liability question.3 We will limit our discussion to the Stong job site because that was the only job site at which the A.L.J. and the Board found the Union vicariously liable for the unfair labor practices of other unions.

Stong is a nonunion contractor. About November 1992, several local labor organizations affiliated with the Building & Construction Trades Council of Philadelphia & Vicinity (BCTC), commenced an organizational campaign among Stong's employees. On March 12, 1993, BCTC and several local unions (Road Sprinkler Fitters Local No. 669, Steamfitters Local No. 420, Plumbers Local No. 74, Sprinkler Fitters Local No. 692, Plumbers Local No. 690,

_____

3. In addition to challenging the joint venture theory of liability, the Union raises several additional issues. One of these issues is the sufficiency of the evidence in support of the Board's conclusion that the Union itself committed unfair labor practices at all three job sites independent of the other unions. We find no merit to the Union's argument and affirm the Board's conclusion that the Union itself committed unfair labor practices at the Delcard, Omni and Stong job sites.

The Union also challenges the sufficiency of the evidence in support of the finding that the Union acted in conjunction with the other unions at the Stong job site, the sufficiency of the evidence in support of the finding that the other unions committed unfair labor practices at the Stong site, and the propriety of the broad cease and desist order. We need not reach these other issues because of our holding that the joint venture theory of agency is invalid.

4

and Local No. 19), petitioned for a Board-conducted election in a single unit comprising all Stong employees performing construction and/or fabrication work in Philadelphia and its vicinity. An election was conducted on May 13, which the unions lost.

After the election, Swarthmore College commenced a construction project on which Stong was the only nonunion subcontractor. Stong's subcontract covered sprinkler work, installation of plumbing and piping, steam-fitter work, and related insulation. Swarthmore established three separate entrances to the campus for access to the project, with gate 1 reserved for exclusive use by Stong.

On June 2, the Union, together with Sprinkler Fitters Local No. 692, Plumbers Local No. 690, Steamfitters Local No. 420, and Asbestos Workers Local No. 14, commenced picketing at the Swarthmore site in furtherance of their labor dispute with Stong.4 The complaint alleges, and the A.L.J. found, that the Union violated S 8(b)(1)(A) of the Act5 by blocking ingress of employees to the job site and impliedly threatening employees with violence in the course of picketing at gate 1 and S 8(b)(4)(ii)(B) 6 by picketing neutral employees at the other gates.

_____

4. Local Nos. 669 and 74, who were part of the joint election campaign, played no role in the subsequent picketing at Swarthmore.

5. Section 8(b)(1)(A) of the Act, 29 U.S.C.A.S 158(b)(1)(A), provides:

     (b) It shall be an unfair labor practice for a lab or organization or its
     agents --

      (1) to restrain or coerce (A) employees in the  exercise of the rights
     guaranteed in section 157 of this title[.]

Section 7, 29 U.S.C.A. S 157, provides:

      Employees shall have the right to self-organization, to form, join,
     or assist labor organizations, to bargain collectively through
     representatives of their own choosing, and to engage in other
     concerted activities for the purpose of collective bargaining or other
     mutual aid or protection, and shall also have the right to refrain
     from any or all of such activities[.]

The A.L.J. and the Board found that the unions violated the Stong employees' right to refrain from exercising these rights by blocking their

access to the job site and by implicitly threatening them with violence.

6. Section 8(b)(4)(ii)(B) of the Act, 29 U.S.C.A.S 158(b)(4)(ii)(B), provides:

(b) Unfair labor practices by labor organization

5

It is undisputed that Local Nos. 692, 690, 420, 14, and the Union picketed at gate 1 during the period from June 2 through July 22. All of the picketing unions except Local No. 14 were petitioners in the May election and all were affiliated with BCTC, a BCTC subsidiary group (Delaware and Chester County Building Trades) and the Mechanical Trades Council. At the BCTC meetings prior to the commencement of the Swarthmore project, representatives of the unions discussed Stong's participation in the Swarthmore project and eventually agreed that all would picket the site. They mutually arranged days for each union to picket and agreed upon the manner of picketing, including the number of pickets and the posting of "observers" at the neutral gates. They monitored and consulted with each other and exchanged information on the progress of the picketing. Representatives of the unions were present at each others' picket lines. During the picketing, the representatives of the unions met three times with either the general contractor or the College. The last of these meetings resulted in a joint agreement by the unions to cease picketing based on assurances they received from the College. After the picketing ceased, the picketing unions jointly distributed handbills at various locations over the names of the five picketing unions.

Based on these facts the A.L.J. found that the unions were acting pursuant to a joint venture, and that therefore the Union was liable for the unfair labor practices

_____

It shall be an unfair labor practice for a labor organization or its

agents --

(4)(ii) to threaten, coerce, or restrain any p erson engaged in commerce or in an industry affecting commerce, where in either case the object is --

(B) forcing or requiring any person to cease u sing, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor or manufacturer[.]

The A.L.J. and the Board concluded that the unions"induced and encouraged employees of [the general contractor] and Swarthmore to cease doing business with Stong[,] thereby violat[ing] Section 8(b)(4)(b)."
Sheet Metal Workers Int'l Ass'n, 1995 WL 77107, at *25.

committed by the other unions. The A.L.J. made nofinding that Local No. 19 had control over the other unions; rather, he based his finding on a factual conclusion that the unions were equals acting together in pursuit of a common goal.

III.

Our authority to review an order of the NLRB is limited. The Board's construction of a statute is ordinarily afforded considerable deference: "we will enforce a Board order that rests on a construction of the NLRA that is not`an unreasonable or unprincipled construction of the statute' " NLRB v. Joy Techs., Inc., 990 F.2d 104, 108 (3d Cir. 1993), quoting Ford Motor Co. v. NLRB, 441 U.S. 488, 497 (1978); Dorsey Trailers, Inc. v. NLRB, 134 F.3d 125, 129 (3d Cir. 1998); NLRB v. Greensburg Coca-Cola Bottling Co., Inc., 40 F.3d 669, 670 (3d Cir. 1994); see also Bro-Tech Corp. v. NLRB, 105 F.3d 890, 894 (3d Cir. 1997) ("If the Board adopts a rule that is rational and consistent with the Act, then the rule is entitled to deference from the courts. . . . Deference to the Board, however, is not automatic but depends substantially on the persuasiveness of the agency view." ) (citations omitted).

In Ford Motor Co., the Supreme Court held that the Board's construction of a statute was entitled to "considerable deference" because the issue in that case -- determining whether in-plant cafeteria and vending machine prices were "terms and conditions of employment" subject to mandatory collective bargaining under SS 8(a)(5) and 8(d) of the Act -- required use of the NLRB's expertise in the labor field. 441 U.S. at 495. Moreover, "Congress [had] assigned to the Board the primary task of construing these provisions in the course of adjudicating charges of unfair refusals to bargain." Id.

This case requires us to interpret S 2(13) of the Act; Congress did not delegate to the Board the power to interpret that section. Overnite Transp. Co. v. NLRB, No. 97-1387, 1998 WL 155574 (D.C. Cir. April 7, 1998). In addition, as discussed below, this case requires application of common law principles of agency and, unlike the issue in

Ford Motor Co., the NLRB has no special expertise applying those common law principles; that expertise lies with the Court. Therefore, "we accord only limited deference to the Board's agency law analysis." International Longshoremen's Ass'n (ILA) v. NLRB, 56 F.3d 205, 212 (D.C. Cir. 1995), cert. denied, 516 U.S. 1158 (1996); Overnite Transp. Co., 1998 WL 155574, at *5.

IV.

The Union argues that S 8(b) of the Act applies only to the unfair trade practices of "a labor organization or its agent," that the other unions were not Local No. 19's agents, and that therefore it is not responsible for the acts of the other unions. We agree.

The Board's decision approving the A.L.J.'s application of a joint venture theory of agency preceded the Court of Appeals for the District of Columbia's rejection of a joint venture theory of agency in International Longshoremen's Ass'n (ILA) v. NLRB, 56 F.3d 205 (D.C. Cir. 1995). We follow the well-reasoned approach taken in ILA.

In ILA the Union requested assistance from Japanese labor unions in its dispute with two shippers who were using nonunion labor to load fruit onto ships bound for Japan. The Japanese unions told the shippers that the unions would refuse to unload fruit in Japan that was not loaded by union labor. The shippers claimed that this was a secondary boycott that amounted to a unfair trade practice. The Longshoremen union did not violate the NLRA and the Japanese unions were beyond the scope of the Act. Therefore the shippers and the Board argued that the ILA was responsible for the Japanese unions' actions under a joint venture theory of agency. The NLRB sought and received an injunction in the Middle District of Florida under this joint venture theory which was affirmed on appeal by the Court of Appeals for the Eleventh Circuit. See Dowd v. International Longshoremen's Ass'n, 781 F. Supp. 1565 (M.D. Fla. 1991), aff 'd, 975 F.2d 779 (11th Cir. 1992). In its decision, the Court of Appeals held that the Board had demonstrated reasonable cause to believe that the ILA had violated the NLRA by articulating "a substantial

8

and not frivolous legal theory on which to attribute the actions of the Japanese unions to the ILA." 975 F.2d at 784. Although acknowledging that the ILA had no right of control over the Japanese unions as is normally required to create an agency relationship, the Court concluded that:

> [u]nder the liberal application of agency concepts
> appropriate in the labor context, a contractual right to
> control and direct the performance of another is not
> required to impose responsibility under section 8(b)
> where an employer or union has encouraged or
> requested another to engage in unfair labor practices
> on its behalf.

Id. at 785 (footnote omitted).

With the injunction in place, the parties submitted the case directly to the Board on stipulated facts. The Board reaffirmed the position it had argued to the Court of Appeals for the Eleventh Circuit and an appeal to the Court of Appeals for the District of Columbia followed.

That Court first determined that "this case gives rise to an unfair labor practice under the NLRA section 8(b)(4)(ii)(B) only if the threats issued by the Japanese unions somehow may be attributed to the ILA." ILA, 56 F.3d at 211. The Court then turned to S 2(13) of the NLRA which provides: "In determining whether any person is acting as an `agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." Congress added this provision in 1947 to make clear that the Act was designed to render both employers and labor organizations responsible for the acts of their agents in accordance with ordinary common law rules of agency.7 Overnite Transp. Co., 1998 WL 155574, at *4; ILA,

_____

7. This Congressional intent was gleaned from the unusually clear legislative history and not from the plain language of the statute. We found nothing in the plain language of statute which validates or invalidates the Board's joint venture theory of agency. In fact, the plain language of S 2(13) is particularly uninstructive in analyzing this question because the section merely states which principles will not

9

56 F.3d at 211; see also H.R. Conf. Rep. No. 510 at 36 (1947), reprinted in 1947 U.S.C.C.A.N. 1135, 1142;8 Local 1814, International Longshoremen's Ass'n v. NLRB, 735 F.2d 1384, 1394 (D.C. Cir. 1984) ("Beyond doubt, the legislative intent of [section 2(13)] was to make the ordinary law of agency applicable to the attribution of individual acts to both employers and unions.")

Applying the common law rules of agency, the Court reversed the Board's holding that Japanese unions were agents of the ILA because the ILA did not control the conduct of the Japanese unions. See ILA, 56 F.3d at 213 ("It is a fundamental principle of hornbook agency law that an agency relationship arises only where the principal `has the right to control the conduct of the agent with respect to matters entrusted to him.' Restatement (Second) of Agency S 14[.]"); see also AT & T Co. v. Winback and Conserve Program, Inc., 42 F.3d 1421, 1434 (3d Cir.) ("An agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent." (citations omitted), cert.

_____

control and does not attempt to affirmatively pronounce which principles will apply. We note, however, that the language of S 2(13) is consistent with applying common law principles of agency because under those principles whether or not the acts performed were actually authorized or ratified by the principal is not controlling. See, e.g., Restatement (Second) of Agency S 159 (1958) (principals can be liable for unauthorized acts by an agent with apparent authority).

8. This view was reinforced by Senator Taft's statement included in the legislative history:

> This [amendment] restores the law of agency as it has been developed at common law. . . . It is true that this definition was written to avoid the construction which the Supreme Court in the recent case of [United Brotherhood of Carpenters v. United States, 330 U.S. 395 (1947)] placed upon section 6 of the Norris-La Guardia Act which exempts organizations from liability for illegal acts committed in labor disputes unless proof of actual instigation, participation, or ratification can be shown. . . . The conferees agreed
> that the ordinary law of agency should apply to employers and union representatives.

93 Cong. Rec. 6859 (1947).

denied, 115 S.Ct. 1838 (1994)); Menichini v. Grant, 995 F.2d 1224, 1233 n.14 (3d Cir. 1993) ("Agency law recognizes the principal's ability to control and monitor agent behavior[.]"); Restatement (Second) of Agency S 1(1) (1958) ("Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to act.")9

The only reported case which gives credence to a joint venture theory of agency is the Court of Appeals for the Eleventh Circuit's affirmance of the injunction entered by the Middle District of Florida. Dowd, 975 F.2d 770. We agree with the Court of Appeals for the District of Columbia that the Court of Appeals for the Eleventh Circuit's analysis is distinguishable. First, the Court of Appeals for the Eleventh Circuit was called upon to review only whether there was reasonable cause to believe that a violation of the Act had occurred and limited its inquiry to an evaluation of whether the Board's theories of law and facts were not insubstantial and frivolous. Id. at 783. "This deferential review is appropriate at the injunction stage even where the

_____

9. Joint ventures are generally governed by partnership law and, like a partner, a member of the venture may be regarded as both a principal and an agent of the other co-venturers. United States v. USX Corp., 68 F.3d 811, 826 (3d Cir. 1995) ("Each member of a joint venture is `considered the agent of the others, so that the act of any member within the scope of the enterprise is charged vicariously against the rest.' "), quoting Pritchett v. Kimberly Cove, Inc., 568 F.2d 570, 579–580 (8th Cir. 1977); 46 Am. Jur. 2d Joint Ventures S 24 (1994); 3 Am. Jur. 2d Agency S 4 (1986). Members of the joint venture, however, are not considered agents of the other co-venturers pursuant to common law principles of agency, but pursuant to partnership law. Harold Gill Reuschlein & William A. Gregory, The Law of Agency and Partnership, 450–55 (2d ed. 1990) (discussing the merging of partnership and joint venture law and stating that as a general rule joint ventures are governed by the same rules as partnerships); Adam B. Weissburg, Reviewing the Law on Joint Ventures with an Eye Toward the Future, 63 S. Cal. L. Rev. 487, 488 (1990) (stating that courts apply partnership principles to joint ventures);
46 Am. Jur. Joint Ventures S 3 (1994). Therefore, even if the other unions were agents of Local No. 19 under joint venture and partnership jurisprudence, they were not agents pursuant to common law principles of agency law and thus were not agents pursuant to S 8 of the Act.

11

theory underlying the petition is `untested' or`novel' in order to preserve the legal issue for Board determination." Id. Second, the Court of Appeals for the Eleventh Circuit did not analyze S 2(13)'s legislative history, which the ILA Court found required invalidation of the Board's joint venture theory of agency. ILA, 56 F.3d at 213.

We hold that the joint venture theory of agency adopted by the A.L.J. and the Board below is inconsistent with S 8 of the Act. We therefore deny the Board's enforcement petition and grant in part and deny in part the Union's cross petition for review.10 Because the A.L.J. recommended and the Board entered the broad cease and desist order based at least partially on the conduct of the other unions who were not "agents" of the Union pursuant toS 8 of the Act, we remand to the Board for further proceedings consistent with this opinion.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit
_____

10. The petition for review is granted to the extent it sought review of the
A.L.J.'s and the Board's conclusion that the Union was liable for the unfair labor practices of other unions pursuant to a joint venture theory of agency. The Union's petition is denied to the extent it argued that there was insufficient evidence in support of the Board's conclusion that the Union committed unfair labor practices itself independent of the actions of the other unions. See supra n.3.

12